ASSET PURCHASE AGREEMENT

Hilario (Chico) and Rebecca Grajeda

SUENO FITNESS INC DBA G.A.C. FITNESS & SPORTS PERFORMANCE CENTER

and

SHANE FRANKLIN

OH STEELE FITNESS LLC

November 1 2022

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "**Agreement**"), dated as of [Date], is entered into by and among [Seller], Hilario (Chico) and Rebecca Grajeda ("**Owner**"), [Company], Sueno Fitness Inc DBA G.A.C. Fitness and Sports Performance Center (the "**Company**"), and [Buyer], a Oh Steele Fitness LLC a Ohio limited liability company ("**Buyer**").

## RECITALS

WHEREAS, Owner and Company wish to sell and assign to Buyer, and Buyer wishes to purchase and assume from Company, the rights of Company and, if applicable, Owner in and to the Purchased Assets (as defined in **Section 1.01**), subject to the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### PURCHASE AND SALE

**Section I.1  Purchase and Sale of Assets.** Subject to the terms and conditions set forth herein, Company and, as and if applicable, Owner, shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Company and, as and if applicable, Owner, all of Company's and Owner's right, title, and interest in and to the following assets of the Company or, as and if applicable, Owner (the "**Purchased Assets**"), free and clear of any mortgage, pledge, lien, charge, security interest, claim, liability, or other encumbrance (collectively, "**Encumbrances**," and any, an "**Encumbrance**"):

(a) all client or customer and supplier lists, client or customer and supplier records, project records, billing records, and other records of the Company or Owner related to the Company's business, clients, customers, suppliers, vendors, or service providers;

(b) all equipment of the Company or Owner related to the Company's business;

(c) any inventory of the Company or Owner related to the Company's business;

(d) all Intellectual Property (as defined in **Section 3.07(a)**);

(e) all goodwill of the Company and all goodwill of the Owner related to the Company or its business or potential business; and

(f) any Assigned Contracts (as defined in **Section 3.08**), it being understood that Company shall terminate any agreements that Buyer does not wish to continue at Buyer's request.

**Section I.2  No Assumption of Liabilities.** Buyer shall not assume any liabilities or obligations of Owner or Company of any kind, whether known or unknown, contingent, matured or otherwise, whether currently existing or hereinafter created. Buyer shall, however, assume and

agree to performance of the obligations under the Assigned Contracts arising after the closing of the transactions contemplated by this Agreement (the "**Closing**").

**Section I.3  Purchase Price.** The purchase price for the Purchased Assets shall be $60,000 (the "**Purchase Price**").

**Section I.4  Allocation of Purchase Price.** Owner and Buyer agree to allocate the Purchase Price among the Purchased Assets for all purposes (including tax and financial accounting) as follows.

| Equipment, inventory, and Intellectual Property | $60,000 |
|---|---|
| Goodwill- Anything Missed in club 11-1-2022 | $0 |

Buyer and Owner shall file all tax returns (including amended returns and claims for refund) and information reports in a manner consistent with such allocation.

**Section I.5  Excluded Assets**. Company and Owner, as applicable, hereby retain ownership of the assets not included within the Purchased Assets (collectively, the "**Excluded Assets**").

## ARTICLE II
### CLOSING

**Section II.1  Closing.** The Closing shall take place on the date hereof (the "**Closing Date**"). The consummation of the transactions contemplated by this Agreement shall be deemed to occur at 12:01 a.m. on the Closing Date. As promptly as possible after the execution and delivery hereof, (i) Owner and the Company shall deliver to Buyer the Purchased Assets, any Transferred Permits (as defined in **Section 3.09**), and a consent to assign to Buyer any Assigned Contract (as defined in **Section 3.08**) that requires consent for Owner or the Company to assign such Assigned Contract (each, an "**Assignment Consent**") and, in each case, duly executed by the consenting party; and (ii) Buyer shall deliver to Owner the Purchase Price.

## ARTICLE III
### REPRESENTATIONS AND WARRANTIES OF OWNER AND THE COMPANY

Owner and the Company jointly and severally represent and warrant to Buyer that the statements contained in this **Article III** are true and correct as of the date hereof. For purposes of this **Article III**, "Owner's knowledge," "knowledge of Owner" and any similar phrases shall mean the actual or constructive knowledge Owner or any director or officer of the Company, after inquiry.

3

**Section III.1 Organization and Authority of Owner and the Company; Enforceability.** Owner is OH Steele Fitness LLC duly organized, validly existing, and in good standing under the laws of the State of Ohio. Each of Owner and the Company has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out such party's obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery, and performance by each of Owner and the Company of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of each of Owner and the Company. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Owner and the Company, and (assuming due authorization, execution, and delivery by Buyer) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Owner and the Company, enforceable against Owner and the Company in accordance with their respective terms.

**Section III.2 No Conflicts; Consents.** The execution, delivery and performance by each of Owner and the Company of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the organizational or governing documents of the Company; (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule or regulation applicable to Owner, the Company, or the Purchased Assets; (c) except to the extent arising from the failure to timely obtain a Required Consent, conflict with, or result in (with or without notice or lapse of time or both) any violation of, or default under, or give rise to a right of termination, acceleration or modification of any obligation or loss of any benefit under any contract or other instrument to which either Owner or the Company is a party or to which any of the Purchased Assets are subject; or (d) result in the creation or imposition of any Encumbrance on the Purchased Assets. No consent, approval, waiver, or authorization is required to be obtained by Owner or the Company from any person or entity (including any governmental authority) regarding the execution, delivery and performance by Owner or the Company of this Agreement and the consummation of the transactions contemplated hereby.

**Section III.3 No Liabilities or Obligations.** To the best of Owner's and the Company's knowledge after reasonable inquiry, neither Owner nor the Company have any liabilities that would transfer with the Purchased Assets and, for the avoidance of doubt, Owner and the Company retain all liabilities of or relating to the Purchased Assets and Excluded Assets except obligations expressly assumed by Buyer in the Assigned Contracts. Any franchise or license rights extended or granted to any third parties have expired or been terminated, and no third parties have rights to use any of the Purchased Assets. To the extent that any third-party attempts to exercise any such right or take any actions that affect the value of the Purchased Assets or Buyer's ability to control the Purchased Assets, Owner will take any and all actions necessary to stop any such attempts or actions of any such third party.

**Section III.4 Absence of Changes.** Since January 1, 2020, other than in the ordinary course of business consistent with past practice, there has not been any event, occurrence, fact,

4

condition, or change that is, or could reasonably be expected to become, individually or in the aggregate, materially adverse to (a) the business, results of operations, condition (financial or otherwise), or assets of the Company, (b) the value of the Purchased Assets, or (c) the ability to consummate the transactions contemplated hereby on a timely basis.

**Section III.5 Title to and Condition of Purchased Assets.** Owner and the Company, either collectively or individually, own and have good and valid title to the Purchased Assets, and all such Purchased Assets are free and clear of Encumbrances.

**Section III.6 Environmental Matters.** To the best of Owner's and the Company's knowledge after reasonable inquiry, it is and at all times has been in material compliance with all environmental laws and has not, and Owner has not, received from any person or entity any (i) environmental notice or threatened or actual environmental claim, or (ii) written request for information pursuant to any environmental law. Neither Owner nor the Company has knowledge of any environmental claim or any pending or threatened investigation by any governmental authority of the Company or any real property owned, leased, or used by the Company. Neither Owner nor the Company has retained or assumed, by contract or operation of law, any material liabilities or obligations of any third parties under any environmental law.

**Section III.7 Intellectual Property.**

(a) "**Intellectual Property**" means any and all of the following of the Company or the Owner related to the Company or its business or potential business in any jurisdiction throughout the world: (i) assumed names, trademarks, and service marks, including all applications and registrations and the goodwill connected with the use of and symbolized by the foregoing; (ii) copyrights, including all applications and registrations related to the foregoing; (iii) trade secrets, formulations, blends, and confidential know-how; (iv) patents and patent applications; (v) websites and internet domain name registrations; and (vi) other intellectual property and related proprietary rights, interests and protections (including all rights to sue and recover and retain damages, costs and attorneys' fees for past, present, and future infringement and any other rights relating to any of the foregoing).

(b) Owner and the Company, either collectively or individually, own or have adequate, valid and enforceable rights to use all the Intellectual Property, free and clear of all Encumbrances. Neither Owner nor the Company is bound by any outstanding judgment, injunction, order or decree restricting the use of the Intellectual Property or restricting the licensing thereof to any person or entity. With respect to the Intellectual Property, all such Intellectual Property is valid, subsisting, and in full force and effect. No licenses or franchises relating to the Intellectual Property are outstanding or in effect.

(c) Each of Owner's and the Company's prior and current use of the Intellectual Property has not and does not infringe, violate, dilute, or misappropriate the rights of any person or entity, and there are no claims pending or threatened by any person or entity with respect to the ownership, validity, enforceability, effectiveness, or use of the Intellectual Property. No person or entity is infringing, misappropriating, diluting or otherwise violating any of the Intellectual Property, and neither Owner, the Company, nor any Affiliate (as hereinafter defined) of Owner or the Company has made or asserted any claim, demand, or notice against any person

or entity alleging any such infringement, misappropriation, dilution, or other violation. "**Affiliate**," with respect to any person or entity, means any other person or entity that directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common control with, such person or entity; the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.

**Section III.8 Contracts.** Owner and the Company will ensure that Buyer is able to assume any agreement of Owner or the Company that Buyer requests to continue (each, an "**Assigned Contract**," and collectively, the "**Assigned Contracts**"). Each Assigned Contract is valid and binding on Owner or the Company in accordance with its terms and is in full force and effect. None of Owner, the Company or, to Owner's knowledge, any other party thereto is in breach of or default under (or is alleged to be in breach of or default under) or has provided or received any notice of any intention to terminate any Assigned Contract. No event or circumstance has occurred that, with or without notice or lapse of time or both, would constitute an event of default under any Assigned Contract or result in a termination thereof or would cause or permit the acceleration or other changes of any right or obligation or the loss of benefit thereunder. A complete and correct copy of each Assigned Contract has been delivered to Buyer. There are no disputes pending or threatened under any Assigned Contract.

**Section III.9 Permits.** Owner and the Company will transfer to Buyer all permits, licenses, franchises, approvals, authorizations, registrations, certificates, variances and similar rights obtained from governmental authorities included in the Purchased Assets (the "**Transferred Permits**"). The Transferred Permits are valid and in full force and effect. All fees and charges with respect to such Transferred Permits as of the date hereof have been paid in full. No event has occurred that, with or without notice or lapse of time or both, would reasonably be expected to result in the revocation, suspension, lapse, or limitation of any Transferred Permit.

**Section III.10** **Non-foreign Status.** Neither Owner nor the Company is a "foreign person" as that term is used in Treasury Regulations Section 1.1445-2.

**Section III.11** **Compliance With Laws.** Each of Owner and the Company has complied, and is now complying, with all applicable federal, state, and local laws and regulations applicable to ownership and use of the Purchased Assets.

**Section III.12** **Legal Proceedings.** There is no claim, action, suit, proceeding or governmental investigation ("**Action**") of any nature pending or, to Owner's knowledge, threatened against or by Owner or the Company (a) relating to or affecting Owner, the Company, the Purchased Assets or the Assumed Liabilities; or (b) that challenges or seeks to prevent, enjoin or otherwise delay the transactions contemplated by this Agreement. No event has occurred, and no circumstances exist, that may give rise to, or serve as a basis for, any such Action.

**Section III.13** **Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Owner or the Company.

**Section III.14** **Full Disclosure.** To Owner's knowledge, no representation or warranty by Owner or the Company in this Agreement or any other document furnished or to be furnished to Buyer pursuant to this Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained therein, in light of the circumstances in which they are made, not misleading.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants that the statements contained in this **Article IV** are true and correct as of the date hereof. For purposes of this **Article IV**, "Buyer's knowledge," "knowledge of Buyer" and any similar phrases shall mean the actual or constructive knowledge of any director or officer of Buyer, after due inquiry.

**Section IV.1 Organization and Authority of Buyer; Enforceability.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Florida. Buyer has full power and authority to enter into this Agreement and the documents to be delivered hereunder, to carry out its obligations hereunder and to consummate the transactions contemplated hereby. The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder and the consummation of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Buyer. This Agreement and the documents to be delivered hereunder have been duly executed and delivered by Buyer, and (assuming due authorization, execution, and delivery by Owner) this Agreement and the documents to be delivered hereunder constitute legal, valid, and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms.

**Section IV.2 No Conflicts; Consents.** The execution, delivery and performance by Buyer of this Agreement and the documents to be delivered hereunder, and the consummation of the transactions contemplated hereby, do not and will not: (a) violate or conflict with the organizational or governing documents of Buyer; or (b) violate or conflict with any judgment, order, decree, statute, law, ordinance, rule, or regulation applicable to Buyer. No consent, approval, waiver, or authorization is required to be obtained by Buyer from any person or entity (including any governmental authority) in connection with the execution, delivery, and performance by Buyer of this Agreement and the consummation of the transactions contemplated hereby.

**Section IV.3 Legal Proceedings.** There is no Action of any nature pending or, to Buyer's knowledge, threatened against or by Buyer that challenges or seeks to prevent, enjoin, or otherwise delay the transactions contemplated by this Agreement. No event has occurred, and no circumstances exist, that may give rise to, or serve as a basis for, any such Action.

**Section IV.4 Brokers.** No broker, finder, or investment banker is entitled to any brokerage, finder, or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

**Section IV.5 Compliance with Laws**. Buyer has complied, and is now complying, with all applicable federal, state, and local laws and regulations relating to or affecting the operation, conduct, or ownership of its business.

**Section IV.6 Disclosure**. No representation or warranty made herein by Buyer, nor any statement, certificate or instrument furnished or to be furnished to Company by Buyer pursuant to this Agreement or any ancillary agreement related thereto, contains, or will contain, any untrue statement of a material fact or omits or will omit to state any material fact necessary to make the statements contained herein or therein not misleading.

## ARTICLE V
## COVENANTS

**Section V.1 Public Announcements; Access.** Unless otherwise required by applicable law, neither party shall make any public announcements regarding this Agreement or the transactions contemplated hereby without the prior written consent of the other party (which consent shall not be unreasonably withheld or delayed). Company and Owner shall permit Buyer to enter the Company's premises and access the Company's records to conduct due diligence. Company and Owner shall diligently prepare and assist Buyer in preparing to integrate the Purchased Assets into Buyer's operations.

**Section V.2 Restrictive Covenants.** "**Business**" means any and all business of Buyer, including, but not limited to, any and all marketing, sales, and other functions and services related thereto. Each of Owner and the Company (together, the "**Owner Parties**," and each, an "**Owner Party**"), covenants as follows; for the avoidance of doubt, the Owner Parties are jointly and severally liable for adherence to, and liability for breach of, any of the following:

(a) For a period extending from the date hereof to the time that is two years after such date (the "**Restricted Period**"), Owner Party shall not, and shall not permit any of its Affiliates or directors, managing members, managers, officers, employees, consultants, financial advisors, counsel, accountants, or other agents ("**Representatives**") to, without Buyer's express written consent, directly or indirectly, (i) engage in or assist others in engaging in the Business anywhere within a 50-mile radius of the location set forth in the Lease Assignment (the "**Territory**"); (ii) have any interest in any business or venture that engages directly or indirectly in the Business in the Territory in any capacity, including as a partner, shareholder, member, employee, principal, agent, trustee, or consultant; or (iii) intentionally interfere in any material respect with the business relationships (whether formed prior to or after the date of this Agreement) between or among the Company and customers or suppliers of the Company; provided, however Buyer hereby acknowledges that any consulting services that Owner provides to a learning institution shall not be a violation of this **Section 5.02**.

(b) During the Restricted Period, Owner Party shall not, and shall not permit any of its Affiliates or Representatives to, directly or indirectly, (i) hire or solicit any (A) employee of the Company, (B) employee of Buyer, or (C) employee of any of Buyer's Affiliates, (ii) encourage any such Person to leave such employment, or (iii) hire any such employee who has left such employment.

(c) During the Restricted Period, Owner Party shall not, and shall not permit any of its Affiliates or Representatives to, directly or indirectly, solicit or entice, or attempt to solicit or entice, any clients or customers or potential clients or customers of the Company, Buyer, or any of Buyer's Affiliates for purposes of diverting their business or services from the Company, Buyer, or any of Buyer's Affiliates.

(d) Owner Party acknowledges that a breach or threatened breach of this **Section 5.02** would give rise to irreparable harm to Buyer for which monetary damages would not be an adequate remedy and hereby agrees that in the event of a breach or a threatened breach by Owner Party of any such obligations, Buyer shall, in addition to any and all other rights and remedies that may be available to it in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance, and any other relief that may be available from a court of competent jurisdiction (without any requirement to post a bond).

(e) Each Owner Party acknowledges that the restrictions contained in this **Section 5.02** are reasonable and necessary to protect the legitimate interests of Buyer and constitute a material inducement to Buyer to enter into this Agreement and consummate the transactions contemplated by this Agreement. In the event that any covenant contained in this **Section 5.02** should ever be adjudicated to exceed the time, geographic, product, service, or other limitations permitted by applicable law in any jurisdiction, then any court is expressly empowered to reform such covenant, and such covenant shall be deemed reformed, in such jurisdiction to the maximum time, geographic, product, service, or other limitations permitted by applicable law. The covenants contained in this **Section 5.02** and each provision hereof are severable and distinct covenants and provisions. The invalidity or unenforceability of any such covenant or provision as written shall not invalidate or render unenforceable the remaining covenants or provisions hereof, and any such invalidity or unenforceability in any jurisdiction shall not invalidate or render unenforceable such covenant or provision in any other jurisdiction.

**Section V.3 Non-Assignable Contracts**. To the extent that a counterparty's consent to the assignment to Buyer of any Assigned Contract has not been obtained prior to the Closing, Owner and Company shall continue to diligently seek such consent to assignment, and Buyer agrees to reasonably cooperate with Owner and Company in such efforts. To the extent that it appears that the requisite consent will not be obtained within a reasonable time following the Closing despite such diligent efforts and the Assigned Contract cannot be transferred to Buyer, Owner and Company, on the one hand, and Buyer, on the other hand, shall use commercially reasonable efforts to enter into such arrangements (such as subleasing, sublicensing, or subcontracting) to provide to the parties the economic and, to the extent permitted under applicable law, operational equivalent of the transfer of such contract as an Assigned Contract to Buyer as of the Closing.

**Section V.4 Further Assurances.** Following the Closing, each of the parties hereto shall execute and deliver such additional documents, instruments, conveyances and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the transactions contemplated by this Agreement and the documents to be delivered hereunder.

**ARTICLE VI**
**INDEMNIFICATION**

**Section VI.1 Survival.** All representations, warranties, covenants, and agreements contained herein and all related rights to indemnification shall survive the Closing and remain in full force and effect indefinitely.

**Section VI.2 Indemnification By Owner and Company.** Company and Owner shall defend, indemnify, and hold harmless Buyer, its Affiliates, and their respective Representatives from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses of Company or Owner, including, without limitation, those arising from or relating to:

(a) any inaccuracy in or breach of any of the representations or warranties of Owner or the Company contained in this Agreement or any agreement, certificate or instrument to be delivered hereunder;

(b) any breach or non-fulfillment of any covenant, agreement or obligation to be performed by Owner or the Company pursuant to this Agreement or any agreement, certificate or instrument to be delivered hereunder; or

(c) any Excluded Assets or other contracts or assets of Company or Owner which are not being acquired by Buyer hereunder.

**Section VI.3 Indemnification By Buyer.** Buyer shall defend, indemnify, and hold harmless Company, Owner, their Affiliates, and their respective Representatives from and against all claims, judgments, damages, liabilities, settlements, losses, costs, and expenses, including attorneys' fees and disbursements, arising from or relating to:

(a) any inaccuracy in or breach of any of the representations or warranties of Buyer contained in this Agreement or any agreement, certificate, or instrument to be delivered hereunder; or

(b) any breach or non-fulfillment of any covenant, agreement, or obligation to be performed by Buyer pursuant to this Agreement or any agreement, certificate, or instrument to be delivered hereunder.

**Section VI.4 Indemnification Procedures.** Whenever any claim shall arise for indemnification hereunder, the party entitled to indemnification (the "**Indemnified Party**") shall promptly provide written notice of such claim to the other party (the "**Indemnifying Party**"), and the Indemnifying Party must promptly and, in any case, within ten business days advance or reimburse the Indemnified Party for documented, undisputed judgments, damages, liabilities, settlements, losses, costs, and expenses. In connection with any claim giving rise to indemnity

hereunder resulting from or arising out of any Action by a person or entity who is not a party to this Agreement, the Indemnifying Party, at its sole cost and expense and upon written notice to the Indemnified Party, may assume the defense of any such Action with counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall be entitled to participate in the defense of any such Action, with its counsel and at its own cost and expense. If the Indemnifying Party does not assume the defense of any such Action, the Indemnified Party may, but shall not be obligated to, defend against such Action in such manner as it may deem appropriate, including, but not limited to, settling such Action, after giving notice of it to the Indemnifying Party, on such terms as the Indemnified Party may deem appropriate and no action taken by the Indemnified Party in accordance with such defense and settlement shall relieve the Indemnifying Party of its indemnification obligations herein provided with respect to any damages resulting therefrom. The Indemnifying Party shall not settle any Action without the Indemnified Party's prior written consent (which consent shall not be unreasonably withheld or delayed). If the Indemnified Party assumes control of the defense of any Action, the Indemnifying Party must advance reasonable estimates of the Indemnified Party's costs and expenses in connection with such defense. The Indemnifying Party must promptly advance to the Indemnified Party or pay directly to any third party any judgment against an Indemnified Party.

**Section VI.5 Tax Treatment of Indemnification Payments.** All indemnification payments made by Company or Owner under this Agreement shall be treated by the parties as an adjustment to the Purchase Price for tax purposes, unless otherwise required by law.

**Section VI.6 Effect of Investigation.** Buyer's right to indemnification or other remedy based on the representations, warranties, covenants, and agreements of Company and Owner contained herein will not be affected by any investigation conducted by Buyer with respect to, or any knowledge acquired by Buyer at any time, with respect to the accuracy or inaccuracy of or compliance with, any such representation, warranty, covenant, or agreement.

**Section VI.7 Exclusive Remedies.** Subject to **Section 7.13** (Specific Performance), the parties acknowledge and agree that their sole and exclusive remedy for any and all claims (other than claims arising from fraud on the part of a party hereto in connection with the transactions contemplated by this Agreement) for any breach of any representation, warranty, covenant or agreement set forth herein shall be pursuant to the indemnification provisions set forth in this **Article VI**.

### ARTICLE VII
### MISCELLANEOUS

**Section VII.1 Expenses.** All costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby shall be paid by the party incurring such costs and expenses.

**Section VII.2 Notices.** All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a)

when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the addresses set forth on the signature page hereto (or at such other address for a party as shall be specified in a notice given in accordance with this **Section 7.02**).

**Section VII.3 Headings.** The headings in this Agreement are for reference only and shall not affect the interpretation of this Agreement.

**Section VII.4 Severability.** If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

**Section VII.5 Entire Agreement.** This Agreement and the documents to be delivered hereunder constitute the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein, and supersede all prior and contemporaneous understandings and agreements, both written and oral, with respect to such subject matter.

**Section VII.6 Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither party may assign its rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed. No assignment shall relieve the assigning party of any of its obligations hereunder.

**Section VII.7 No Third-party Beneficiaries.** Except as provided in **Article VI**, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

**Section VII.8 Amendment and Modification.** This Agreement may only be amended, modified or supplemented by an agreement in writing signed by each party hereto.

**Section VII.9 Waiver.** No waiver by any party of any of the provisions hereof shall be effective unless explicitly set forth in writing and signed by the party so waiving. No waiver by any party shall operate or be construed as a waiver in respect of any failure, breach or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver. No failure to exercise, or delay in exercising, any right, remedy, power or privilege arising from this Agreement shall operate or be construed as a

waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

**Section VII.10** **Governing Law.** This Agreement shall be governed by and construed in accordance with the internal laws of the State of Florida without giving effect to any choice or conflict of law provision or rule (whether of the State of Florida or any other jurisdiction).

**Section VII.11** **Submission to Jurisdiction.** Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of Florida in each case located in the city in or nearest to the principal place of business of Buyer, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

**Section VII.12** **Waiver of Jury Trial.** Each party acknowledges and agrees that any controversy which may arise under this Agreement is likely to involve complicated and difficult issues and, therefore, each such party irrevocably and unconditionally waives any right it may have to a trial by jury in respect of any legal action arising out of or relating to this Agreement or the transactions contemplated hereby.

**Section VII.13** **Specific Performance.** The parties agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the parties shall be entitled to specific performance of the terms hereof.

**Section VII.14** **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**OWNER: Hilario (Chico) and Rebecca Grajeda**

_____

[Seller] Sign: Hilario (Chino) Grajeda

_____

[Seller] Sign: Rebecca Grajeda
Address:
827 W Central Avenue Springboro OH 45066

**COMPANY: G.A.C. Fitness and Sports Performance**
[Company] Sueno Fitness Inc

By:_____
Name: Hilario (Chino) Grajeda
Title:
Address: 827 W Central Avenue Springboro OH 45066
By:_____
Name: Rebecca Grajeda
Title:
Address: 827 W Central Avenue Springboro OH 45066

**BUYER: OH Steele Fitness LLC**
[Buyer] OH Steele Fitness LLC

By: _____
Name: Shane Franklin
Title: Owner
Address: 203 Hill Rd #23 Dalton, GA 30721

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**OWNER:** Hilario (Chico) and Rebecca Grajeda

[Seller] Sign: Hilario (Chico) Grajeda

[Seller] Sign: Rebecca Grajeda
Address:
827 W Central Avenue Springboro OH 45066

**COMPANY: G.A.C. Fitness and Sports Performance**
[Company] Sueno Fitness Inc

By: _____
Name: Hilario (Chico) Grajeda
Title: chico
Address: 827 W Central Avenue Springboro OH 45066

By: _____
Name: Rebecca Grajeda
Title:
Address: 827 W Central Avenue Springboro OH 45066

**BUYER: OH Steele Fitness LLC**
[Buyer] OH Steele Fitness LLC

By: _____
Name: Shane Franklin
Title: Owner
Address: 203 Hill Rd #23 Dalton, GA 30721

Signature Page to Asset Purchase Agreement